IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 06-216 |
| ) | |
| CLAUDELLE MCMAHILL, ) | |
| ) | |
| Defendant, ) | |

MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court is a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) submitted orally by defendant Claudele[1] McMahill ("defendant" or "McMahill"). After considering the submissions of the parties, the court will deny McMahill's motion because the government introduced sufficient evidence for the jury to return a verdict of guilty.

I.      Background

In June 2006, McMahill was indicted on nine counts of mail fraud for fraudulently receiving unemployment compensation from the Pennsylvania Department of Labor & Industry, in violation of 18 U.S.C. § 1341. (Docket No. 1.) The first of two superseding indictments was filed in January 2007, charging defendant with the same nine counts of mail fraud and an additional count of conspiracy to commit mail fraud between April 2004 and December 2004, in violation of 18 U.S.C. § 371. (Docket No. 74.) The second superseding indictment was filed on

---

[1]  Defendant's first name was misspelled as "Claudelle" on the caption of the indictment (Docket No. 1) and the superceding indictment (Docket No. 74). The proper spelling, "Claudele," however, appears on the second superceding indictment (Docket No. 232).

September 16, 2008, charging McMahill with similar charges of mail fraud and conspiracy to commit mail fraud during the time period spanning April 2004 to December 2004. (Docket No. 232.) In October 2008, the charges against McMahill were tried before a jury. (Docket No. 232.) At the close of the government's case-in-chief, on October 16, 2008, McMahill moved orally for judgment of acquittal with respect to the conspiracy charge under Federal Rule of Criminal Procedure 29(a) ("Rule 29"), alleging that the government did not prove beyond a reasonable doubt that McMahill knowingly participated in a conspiracy to commit mail fraud. The court reserved decision on the motion pursuant to Federal Rule of Criminal Procedure 29(b) and submitted the case to the jury.[2] On October 29, 2008, McMahill was convicted by a jury of all counts, i.e., nine counts of mail fraud and one count of conspiracy. (Docket No. 249.) The present motion only challenges the conspiracy conviction.

II.   **Factual Background**

   A.   **Evidence produced by the government with respect to the mail fraud charges.**

The government introduced evidence of the following facts: In January 2004, McMahill was hired to work at Acme Building Services Co., Inc. ("Acme"). Shortly thereafter Acme's

---

[2] Federal Rule of Criminal Procedure 29(b) provides:

> **(b) Reserving Decision.** The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

business was sold to Lacy Tilley ("Tilley"), McMahill's co-defendant, who continued Acme's operations through United Building Maintenance, Inc. ("UBM"). Following Tilley's acquisition of Acme's business, Tilley instructed four employees, Robert Best ("Best"), Aaron Brown ("Brown"), Jeffrey Kifer ("Kifer"), and Treasa Likert ("Likert"), to apply for unemployment benefits. Rather than terminate the employees, Tilley continued their employment by UBM and provided supplemental payments in an amount equal to the difference between their former salaries and their unemployment benefits. McMahill also received unemployment benefits on various dates relating to the charges of mail fraud while working for UBM, and resided with Tilley during the time of the conspiracy.

> **B.    Evidence presented to the jury in the government's case-in-chief with respect to McMahill's participation in a conspiracy to commit mail fraud.**

Four UBM employees testified that Tilley directed them to apply for unemployment benefits. Best testified about his recollections of conversations with Tilley with respect to UBM's pecuniary troubles and the decision to have employees apply for unemployment:

> (Best):    When they took over the company, I had took the payroll in, and [Tilley] says, well, how am I going to pay this? I don't have – there's not enough money here to pay this out. And you got to figure out how we're going to pay this.... And so, the next day when I come in, he says, don't worry. I got it figured out.

Trial Tr. Docket No. 297, 150:6-12 (Oct. 14, 2008). In a subsequent conversation, Tilley instructed Best to apply for unemployment benefits, and told Best that the remainder of his salary would be paid under the table. Best testified:

> (Best):    As far as I can remember, it was just Lacy and myself, and it was just brought up that, that if they wanted to keep the jobs there, because they didn't have enough money to pay us what we were

3

> making, that we could apply for – we would have to apply for unemployment, and they would pay us the rest of our salary under the table.

Id. at 151:11-16.  With respect to his compensation, Best testified "at Acme I was making like $600.00 a week, and on unemployment, I was getting $337.00.  And they made – I was getting like $300.00 a week under the table," which he received in the form of a check.  Id. at 151:20-25.  Brown also provided testimony about Tilley's instructions to apply for unemployment.  Brown testified:

> (Brown):   What I can recall, [Tilley] had mentioned to me that being that Acme had been sold, that I might be able to get unemployment, and telling [the unemployment office] that the new company wasn't hiring me, or I would be laid off.

Trial Tr. Docket No. 298, 38:18-21 (Oct. 15, 2008).  Brown testified that he observed McMahill coming to work at UBM and that she had an office with a desk which she frequently used.  Id. at 45:11-22.

Kifer provided similar testimony about a conversation with Tilley, stating, "[t]he conversation [with Tilley] was, with the start-up of the new company, there would not be moneys available to pay us managers. We were instructed to sign up for unemployment."  Trial Tr. Docket No. 299, 4:20-22 (Oct. 16, 2008).  Kifer explained Tilley's plan for paying him, testifying:

> (Kifer):   Um, how I was to be paid would be, um, the unemployment payments, and they would compensate between, the difference between what I was making at Acme and what I was receiving from unemployment, I would be paid – the remainder would be paid by check.

4

<u>Id.</u> at 5:14-18.  Kifer recalled that because he became UBM's director of sales and marketing, he had to train McMahill to take over the day-to-day operations of UBM.  <u>Id.</u> at 6:19-7:6.

Likert testified about a meeting she had with Tilley about applying for unemployment benefits.  Likert testified:

> (Likert):  We had a, a meeting with Lacy Tilley. He explained that he could not afford to keep us on the payroll as it was being provided to us from Acme Building Services; that if we wanted to keep our job, we would have to collect unemployment. He would pay the difference of whatever our unemployment was bi-weekly. He would pay us the difference that totaled the salary that we was making before he took over.

<u>Id.</u> at 56:4-10.  Likert testified that she received the maximum six months compensation from unemployment benefits while contemporaneously receiving compensation under the table from UBM.  <u>Id.</u> at 59:19-60:2.

Likert testified that McMahill provided her with a letter so that she would not have to attend an appointment with representatives of the unemployment office.  Trial Tr. Docket No. 299, 65:1-66:25 (Oct. 16, 2008).  Likert testified that when she brought in a letter from the unemployment office, McMahill had to check with Tilley before making any changes to Likert's compensation.

> I had received a letter in the mail from unemployment telling us how much money we was allowed to [sic] make while collecting our unemployment. It was only a few dollars more than what they were paying me. I took the letter in to Claudele. I showed her the letter and I asked her, can I turn this in? She had told me that she would get back to me. She had to talk to [Tilley]. Claudele, a couple of days later had told me that [Tilley] said to leave things as it is.

Trial Tr. Docket No. 299, 66:16-23 (Oct. 16, 2008).

Jeffrey Ulery, one of three UBM stockholders, testified that Tilley was directing employees to apply fraudulently for unemployment benefits, stating:

> (Ulery): [W]hen UBM first took over Acme, UBM was losing a lot of money, and [Tilley] had figured out a way to save some money by having the employees apply for unemployment benefits under Acme. He said, [it] isn't that it would hurt Acme, because Acme was going out of business; thereby, it wouldn't increase their unemployment rates, and he would be able to save money by the employees receiving unemployment, and then, him paying them the difference between what they used to make and what they were making.

Trial Tr. Docket No. 298, 125:7-15 (Oct. 15, 2008). Each employee involved in the scheme applied for unemployment benefits around the same time – April or May 2004. Gov't Exs. UC-9 (Best), UC-10 (Likert), UC-11 (Brown), UC-8 (Kifer). McMahill applied for unemployment benefits around the same time – April 2004. Gov't Exs. UC-6, UC-7.

The government introduced into evidence an e-mail dated November 3, 2004, addressed from McMahill to Tilley in which McMahill advised Tilley about when Best and Likert would be eligible to apply for unemployment benefits again. Gov't Ex. SWC-9. McMahill wrote:

> Lacy, I was correct last night. There are 66 active jobs to do QCI & FSI each month, Bob cleared 950.00 and Treasa cleared 905.00 under ACME. Both of them will be required to earn $2,100 to reapply for UC. Please call me to discuss this information. I will be leaving at 1:00 PM. I need to get some salary entered into paycore for Brenda to process for Bob & Treasa prior to that time. Thanks, Claudele.

Id. The government introduced into evidence a tablet found on May 4, 2005, at the residence McMahill and Tilley shared on which there were the following notes and calculations about Likert:

6

    TREASA
    ACME  $905 Clear e/o week
        <u> -322 UE ½       </u>
        $583 Gross

Gov't Ex. SWR-2.

  Crystal Zombeck ("Zombeck"), an employee at UBM who once shared an office with McMahill, confirmed that McMahill lived in the same residence as Tilley. Trial Tr. Docket No. 298, 63:23-64:1 (Oct. 15, 2008). Zombeck testified about the notes and calculations on the tablet that investigators seized from McMahill's home. <u>Id.</u> at 75:1-26; Gov't Ex. SWR-2. Zombeck identified the writing on the tablet as McMahill's writing. Trial Tr. Docket No. 298, 74:20-75:9 (Oct. 15, 2008). The government's counsel questioned Zombeck as follows:

  (Counsel): Now, how long did you say you worked with Miss Miss McMahill?

  (Zombeck): I actually worked there from January until December of '04.

  (Counsel): And based upon that, during that time frame did you get to observe her writing materials?

  (Zombeck): Yes.

  (Counsel): Okay. And based upon that, were you able to get familiar with her handwriting?

  (Zombeck): Yes.

  (Counsel): Do you recognize the handwriting on SWR-2?

  (Zombeck): Yes. It is Claudele's.

  (Counsel): I'm going to show you what's been marked as SWR-14. You recognize the handwriting on that document?

  (Zombeck): Yes. It's Claudele's as well.

Id.[3]  Zombeck acknowledged she had no training or experience in assessing the handwriting of another individual to identify the source of that handwriting and never examined handwriting exemplars.  Id. at 80:9-81:7.

The government presented evidence that McMahill signed the "under the table" checks to the employees receiving unemployment benefit.  E.g., Trial Tr. Docket No. 297,  165:19-167:25 (Oct. 14, 2008); Trial Tr. Docket No. 299, 68:13-69:15 (Oct. 16, 2008).  Funder Blue ("Blue") testified that she was a records custodian for First National Bank.  Trial Tr. Docket No. 296, 101:13-24.  (Oct. 16, 2008).  Blue reviewed the government's exhibits FNB-1 to FNB-7 (signature cards and negotiated checks).  Id. at 102; Gov't Exs. FNB- 1 to FNB-71 (UBM account activity), Id. at 104-06.  Blue was unable to verify that McMahill signed the account signature cards (Gov't Exs. FNB-1 to FNB-4) that bear images of McMahill's signature.  Id. at 107-08.  Blue was unable to distinguish among signatures that were mechanically, versus personally, applied on the exhibit checks the government asked her to review from the witness stand.  Id. at 109.

---

[3]Federal Rule of Evidence 701 provides:

> **Rule 701. Opinion Testimony by Lay Witnesses**
>
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.

There was no challenge to Zombeck's testimony under Rule 701.

**III.     Standard of Review**

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) shall be granted if the evidence is insufficient to sustain a conviction of the offense. FED R. CRIM. P. 29(a). A court's first inquiry must be whether the jury's guilty verdict was supported by substantial evidence. United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1998). "[A] finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

A defendant has a very heavy burden to show insufficiency of the evidence. United States v. Gonzales, 918 F.2d 1129, 1132 (3d Cir. 1990). It is well established that when ruling on a post-conviction challenge to the sufficiency of evidence, a court must view all evidence in the light most favorable to the government. See Id. If a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt based upon the available evidence, the court must sustain the jury's verdict. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998). Circumstantial evidence may be used to prove the elements of a conspiracy. See United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986). A court must "' draw all reasonable inferences in favor of the jury's verdict.'" Smith, 294 F.3d at 476 (quoting United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996)). "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (assessing credibility of witnesses, assigning weight to the evidence, and drawing inferences of fact from the evidence are functions of the jury). The court must decide the motion based solely on the evidence presented during the government's case-in-

chief.  FED. R. CRIM. P. 29(b).

IV.   Discussion

McMahill argues that while there was sufficient evidence introduced during the government's case-in-chief with respect to her mail fraud charges, 18 U.S.C. § 1341, the government's evidence was insufficient to prove beyond a reasonable doubt that she knowingly participated in a conspiracy in violation of 18 U.S.C. § 371.  McMahill contends that the government failed to prove she had the requisite scienter requirement to be a party to a conspiracy.  Because the government presented sufficient evidence, the court will deny defendant's motion for judgment of acquittal.

   A.   Mail Fraud

For a jury to find a defendant guilty of mail fraud "the government must prove that a scheme to defraud existed, that each defendant participated in that scheme, and that each participated with specific intent to defraud."  United States v. Picciotti, 40 F. Supp.2d 242, 245 (3d Cir. 1999) (citing United States v. Pflaumer, 774 F.2d 1224, 1233 (3d Cir. 1985)). McMahill correctly posits that a showing of mail fraud does not necessarily impute conspiracy.  See, e.g., United States v. Pappas, 445 F.2d 1194, 1198 (3d Cir.1971) (noting that conspiracy is a separate offense distinct from a related substantive crime); United States v. Bearden, 265 F.3d 732 (8th Cir. 2001) (mail fraud, and conspiracy to commit mail fraud, are distinct offenses).

   B.   Conspiracy

18 U.S.C. § 371 provides that it is a crime "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect

the object of the conspiracy. . . . " 18 U.S.C. § 371. In this case the charge involves an alleged conspiracy to commit mail fraud, which is an offense against the United States. The elements of a criminal conspiracy are: 1) an agreement by two or more persons, 2) a shared unity of purpose between the conspirators to achieve a common goal of committing an offense against the United States, and 3) the performance of an overt act by at least one of the members of the conspiracy in furtherance of the agreement. United States v. Navarro, 145 F.3d 580, 593 (3d Cir. 1998); United States v. Rankin, 870 F.2d 109, 113 (3d Cir. 1989); United States v. Uzzolinio, 651 F.2d 207, 214 n.13 (3d Cir. 1981).

McMahill does not dispute that sufficient evidence of an overt act of mail fraud was introduced. Therefore, the government satisfied its burden with respect to the third element. McMahill disputes the first two elements. McMahill argues that the evidence presented, which the jury used to find her guilty of mail fraud, was not substantial enough to prove her complicity in a conspiracy. McMahill claims that the government did not present sufficient evidence to prove she knowingly agreed to join Tilley in his fraudulent scheme.

**1. First Element – an agreement**

To prove a conspiracy, the jury must find that an agreement existed with the purpose to commit an offense against the United States. An agreement is the essential element of conspiracy and the evil at which the crime of conspiracy is directed. Iannelli v. United States, 420 U.S. 770 (1975); United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989). The government does not have to prove the existence of a formal or written agreement or an express oral agreement spelling out the details of the understanding. Iannelli, 420 U.S. at 777 n.10. The government does not have to prove that all the members of the conspiracy discussed among themselves their unlawful objectives, or agreed to all the details, or agreed to what the means

were by which the objectives would be accomplished.  Kelly, at 259.  What the government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at some type of agreement, mutual understanding, or meeting of the minds to try to accomplish a common and unlawful objective.  United States v. Appelwhaite, 195 F.3d 679, 684 (3d Cir. 1999); United States v. Addonizio, 449 F.2d 100, 101-02 (3d Cir. 1971); United States v. Frank, 290 F.2d 195, 196 (3d Cir. 1961); United States v. Lester, 282 F.2d 750, 753 (3d Cir. 1960); see United States v. Basroon, 38 F. App'x 772, 780 (3d Cir. 2002).  Since agreements to engage in criminal activity are inherently clandestine, direct evidence is often rare.  United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001).  The government may use circumstantial evidence if it is sufficient to create a "'reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'"  United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986) (quoting United States v. Ellis, 595 F.3d 154, 160 (3d Cir. 1979), cert. denied, 444 U.S. 838 (1979)).

In the instant case the government did not present direct evidence proving the existence and participation in an agreement between McMahill and Tilley or between McMahill and any of the co-conspirators.  The government presented sufficient circumstantial evidence, however, from which a jury could infer beyond a reasonable doubt that an agreement existed and McMahill participated in the agreement.  The government presented witnesses, Best, Brown, Kifer and Likert, who testified that Tilley directed them to apply for unemployment benefits.  Likert testified she spoke with McMahill about a letter Likert received from "unemployment" and was told by McMahill that Tilley "said to leave things as it is."  Trial Tr. Docket No. 299, 66:16-23 (Oct. 16, 2008).  Jeffrey Ulery testified that Tilley was directing employees to apply fraudulently for unemployment benefits.  Evidence of McMahill's commission of mail fraud was

introduced. This evidence is sufficient for a jury to find that an agreement to commit an offense against the United States existed.

The government presented evidence of emails between McMahill and Tilley from which the jury could infer McMahill's involvement in the agreement. In the emails, McMahill references the amounts two ACME employees cleared and the amounts each would be required to earn to reapply for unemployment benefits. Her involvement in salary entries is also evidence, when considered with other evidence, from which a jury could infer McMahill's involvement in the agreement.

The government introduced into evidence a tablet McMahill used to calculate unemployment benefits for Likert. The notes on the tablet are evidence upon which a jury could infer that McMahill knowingly and intentionally joined in the agreement. The government introduced numerous checks into evidence which were signed by McMahill to UBM employees or cross-endorsed from McMahill to Tilley which implicate McMahill in the conspiracy. For example, United Building Maintenance Inc. check # 1133, in the amount of $300.00 was dated 8/27/2007, was made payable to Bob Best, and was signed by Claudele McMahill. These checks, representing the difference between the amount of the unemployment benefits and the employee's total salary, are evidence from which a jury could infer the existence of an agreement and McMahill's involvment in the agreement.

**2. Second Element – shared unity of purpose**

The jury must find the government proved beyond a reasonable doubt that McMahill knew the objective of the conspiracy, joined the conspiracy to effectuate that objective, and that at least one other alleged conspirator shared a unity of purpose toward the objective. United States v. United States Gypsum Co., 438 U.S. 422, 443 n.20 (1978) ("In a conspiracy, two

13

different types of intent are generally required – the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy. . . ."). United States v. Korey, 472 F.3d 89, 93, 98 (3d Cir. 2007); United States v. Gibbs, 190 F.3d 188, 197 (3d Cir.1999)(citing United States v. Robinson, 167 F.3d 824, 829 (3d Cir. 1999)) ('To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal."). The use of both direct evidence and circumstantial evidence is permissible. Ingram v. United States, 360 U.S. 672, 680 (1959).

Once the jury has determined that a conspiracy existed, it must also find that the government proved beyond a reasonable doubt that McMahill knowingly, voluntarily and intentionally joined the agreement during its existence. See United States v. McKee, 506 F.3d 225, 241 (3d Cir. 2007) (citing Rankin, 870 F.2d at 113); see also United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988) (citing United States v. Kates, 508, F.2d 308, 310-11 (3d Cir. 1975) (To prove the defendants' participation in the conspiracy, the government also had to establish "a 'unity of purpose,' the intent to achieve a common goal. . . ."); United States v. Am. Investors of Pittsburgh, Inc., 879 F.2d 1087, 1100 (3d Cir.), cert. denied, 493 U.S. 955, 110 S. Ct. 368 (1989). The government does not need to show that McMahill knew every detail of the plan, or even that her role was substantial. McKee, 506 F.3d at 241. Both direct evidence and circumstantial evidence may be used to determine whether McMahill knew about the agreement and intended both to join it and to accomplish its illegal objective. Id.

The evidence presented by the government discussed with respect to the first element – an agreement – also supports the second element – shared unity of purpose. As noted, the government presented evidence of emails between McMahill and Tilley from which the jury

14

could infer McMahill's involvement in the agreement. In the emails, McMahill references the amounts two ACME employees cleared and the amounts each would be required to earn to reapply for unemployment benefits. Her involvement in salary entries is also evidence together with the other evidence introduced from which a jury could infer that McMahill knew about the objective of the agreement, joined the conspiracy to effectuate that objective, and that at least one other conspirator, i.e., Tilley, shared a unity of purpose toward the objective.

The government introduced into evidence a tablet containing McMahill's notes and calculations of the under-the-table payments to Likert. These notes and calculations are evidence upon which a jury could infer that McMahill knowingly and intentionally joined in the agreement. The government introduced numerous checks into evidence which were signed by McMahill to UBM employees or cross-endorsed from McMahill to Tilley which implicate McMahill in the conspiracy. For example, United Building Maintenance Inc. check # 1133, in the amount of $300.00 was dated 8/27/2007, was made payable to Bob Best, and was signed by Claudele McMahill. These checks, representing the difference between the amount of the unemployment benefits and the employee's total salary, are evidence from which a jury could infer McMahill's desire to achieve the shared objective of the agreement. Based upon a review of the evidence introduced by the government during its case-in-chief, the court concludes that McMahill knew about the objective of the agreement, joined the conspiracy to effectuate that objective, and that at least one other conspirator, i.e., Tilley, shared a unity of purpose toward the objective.

IV.   **Conclusion**

Considering all the evidence introduced during the government's case-in-chief, the court

concludes there was sufficient circumstantial evidence for a jury to infer the existence of an agreement, the intent of McMahill to join in that agreement, and McMahill's desire to achieve the shared objective of the agreement.  McMahill does not dispute that there was sufficient evidence of an overt act of mail fraud introduced.  Under those circumstances, the court finds that the government presented sufficient evidence for a jury to find beyond a reasonable doubt that Claudelle McMahill was guilty of conspiracy to commit mail fraud.  McMahill's motion for judgment of acquittal is DENIED.

                                                          By the Court:

Date: October 30, 2009                  /s/ JOY FLOWERS CONTI
                                                      Joy Flowers Conti
                                                      United States District Judge